## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ANDREW GARRETT,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:09cv00018 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:  GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

### I. Background and Standard of Review

The plaintiff, Andrew Garrett, ("Garrett"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Garrett's claim for supplemental security income, ("SSI"),  under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.*  (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3). (West 2003 & Supp. 2009).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'"  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Garrett protectively filed his application for SSI on May 16, 2005, (Record, ("R."), 62-66), alleging disability as of January 1, 1998, [1] due to dyslexia, vertigo, gout, a learning disability, headaches and deafness in one ear.  (R. at 104.)  The claim was denied initially and upon reconsideration.  (R. at 47-49, 56-58.)  Garrett then requested a hearing before an administrative law judge, ("ALJ").  (R. at 59.)  A hearing was held on February 6, 2007, at which Garret was present and represented by counsel.  (R. at 328-43.)

By decision dated March 28, 2007, the ALJ denied Garrett's claim.  (R. at 13-19.)  The ALJ found that Garrett had not engaged in substantial gainful activity since the alleged onset date of disability.  (R. at 18.)  The ALJ found that Garrett suffered from the following severe impairments: hearing loss in his right ear resulting in vertigo, a learning disability and bilateral lower extremity swelling.  (R. at 18.)  However, the ALJ found that the impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (R. at 18.)  The ALJ found that Garrett had the residual functional capacity to perform simple,

---

[1] Garrett previous filed an application for SSI, (R. at 60-61), which was denied initially and upon reconsideration.  (R. at 36-40, 44-46.)  The claim was not pursued further.  (R. at 14.)

repetitive, non-stressful work at the medium[2] level of exertion and should not be put in a position that required acute hearing.  (R. at 18.)  Additionally, the ALJ found that Garrett could not climb ladders or balance and he should have the same protections as someone with a seizure disorder, such as not being around unprotected heights or dangerous moving machinery.  (R. at 18.)  The ALJ noted that despite Garrett's hearing loss, he could hear normal conversation in close proximity.  (R. at 18.)  The ALJ noted that Garret had no past relevant work experience and was a younger individual under 20 C.F.R. § 416.964.  (R. at 18.)  Based on Garrett's age, education, residual functional capacity and work experience, the ALJ found that Garrett could perform jobs existing in significant numbers in the national economy, including jobs as a hand packer, a sorter, an assembler, an inspector, a cleaner and a general laborer.  (R. at 18.)  As such, the ALJ found that Garret was not under a "disability" as defined by the Act.  (R. at 19.)  *See* 20 C.F.R. § 416.920(g) (2009).

After the ALJ issued his decision, Garrett pursued his administrative appeals and sought review of the ALJ's decision, but the Appeals Council denied his request.  (R. at 5-8.)  Garrett then filed this action seeking review of the ALJ's decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. § 416.1481 (2009).  This case is before the court on Garrett's motion for summary judgment, which was filed September 8, 2009, and on the Commissioner's motion for summary judgment filed on October 8, 2009.

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, that person can also perform sedentary and light work.  *See* 20 C.F.R. § 416.967(c) (2009).

*II. Facts*

Garrett was born on April 30, 1976, which classifies him as "younger person" under 20 C.F.R. § 416.963(c). (R. at 112.) According to the record, Garrett earned a general equivalency development diploma, ("GED"). (R. at 109.) Garrett's past work experience includes a job as a security guard, which lasted only one shift. (R. at 105.)

At the ALJ hearing, Garrett testified that the last grade he completed in school was the eleventh-grade and the school gave him a condensed program allowing him to earn his diploma early[3] because the school was afraid he would quit. (R. at 331.) Garrett claimed that he had to quit his job as a security guard after only one day because he could not handle the walking or the stress of the job. (R. at 332.) Garrett stated that he had never attempted to get his driver's license because he was afraid he would hurt someone because he did not handle stress well and had trouble riding in a car since he was involved in an automobile accident, which occurred two or three years prior to the hearing. (R. at 332.) Garrett claimed that he took a driver's education class, but that he could not drive because he became too nervous that something would happen to his passengers. (R. at 332-33.)

Garrett stated that he had trouble hearing with his right ear and that the hearing in his left ear was diminishing. (R. at 333.) Garrett testified that he had an operation on his right ear, which removed the eardrum and all the small bones on that side leaving him with no hearing in the right ear. (R. at 333.) Garrett alleged that his

---

[3] This testimony is in contradicts the information contained in the disability report dated September 18, 2006, which indicated that Garrett earned a GED. (R. at 109.)

difficulty with his right ear caused him to suffer dizziness and vertigo. (R. at 333.) Garrett stated that the dizziness occurred at least three times a day and was caused by standing, flashing lights, turning around quickly and bending down and standing upright. (R. at 333-34.) Garrett also claimed that he frequently fell down. (R. at 334.) Further, Garrett alleged that he suffered from weekly headaches that were brought on by cold air or a lot of heat. (R. at 334-35.) Garrett stated that he started experiencing the headaches after his eardrum burst and he had recurrent infection in his ear. (R. at 335.) Garrett explained that his ear frequently "[ran] a puss" resulting in infectious sores in his ears. (R. at 335.) Garrett alleged that the infection got to the point that puss would run down his face three or four times a week. (R. at 335-36.) Garrett claimed that he experienced pain inside his ear, which was separate from the headaches. (R. at 336.) Garrett testified that his most severe headaches caused him to black out and that this occurred approximately once every two weeks. (R. at 336.)

Garrett also testified that he had swelling in his feet and knees and that he had gout. (R. at 337.) Garrett claimed that his trouble with his legs resulted from a combination of an automobile accident and a fall in which he fell about eight feet. (R. at 337.) Garrett indicated that the gout caused his feet to swell. (R. at 337.) Garrett alleged that the trouble with his legs caused him to experience pain when walking, noting that about four times a month it was so severe he could not walk. (R. at 337.) Garrett stated that the pain lasted anywhere from two days to a week. (R. at 337.)

Garrett testified that he experience trouble in social situations. (R. at 337.) Garrett stated that when he was around a lot of people he felt as if they were singling him out, staring at him, whispering about him and making fun of him. (R. at 338.)

Garrett claimed that he lived with his mother and, prior to coming to the hearing, he had not left his home for four months and, prior to that, he had not left for six months. (R. at 338.) Garrett alleged that he was unable to do any household chores or activities, explained that his mother or sister performed all chores. (R. at 338.) Garrett claimed he was not currently treated by doctors because he could not afford the visits and owed a lot of money for prior medical care. (R. at 338-39.) Garrett claimed that he did not fill his prescriptions and could not remember the last time he did so. (R. at 339.)

In addition to the testimony of Garrett, the ALJ heard testimony from Donna Bardsley, a vocational expert. (R. at 340-42.) The ALJ asked Bardsley to assume that the claimant was limited to simple, repetitive, non-stressful work at the medium level of exertion, had a right-sided hearing loss, should not be put in a position where he would need acute hearing, but could hear in close proximity, he could not climb ladders or balance and should not be around unprotected heights or dangerous moving machinery. (R. at 340.) Bardsley opined that, under those facts, there were a significant number of jobs in the regional and national economies available to Garrett, including jobs as a hand packer, a sorter, an assembler, a cleaner, an inspector and a general laborer. (R. at 341.) Bardsley was of the opinion that if Garrett's testimony was credible there would be no jobs available. (R. at 341.) The jobs listed by Bardsley would not be inconsistent with the Dictionary of Occupational Titles even if Garrett suffered from borderline intelligence or a learning disability in math. (R. at 341-42.) Next, Bardsley was asked to consider the limitations expressed in B25F[4].

---

[4] Exhibit B-25 F is a Residual Functional Capacity Assessment (Mental) completed by state agency psychologist Joseph Leizer, Ph.D. (R. at 291-94)

(R. at 342.)  Bardsley opined that a combination of the limitations expressed therein would eliminate any job possibilities.  (R. at 342.)

In making his decision the ALJ considered medical evidence from: Indian Path Medical Center; Mountain Region Speech and Hearing; Dr. Richard M. Surrusco, M.D., a state agency physician; R.J. Milan Jr., Ph.D., a state agency psychologist; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Kevin Blackwell D.O., a state agency physician; Stone Mountain Health Services; Dr. Randall Hays, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; and Lee Regional Medical Center.

On May 31, 2002, Garrett presented to Stone Mountain Health Services, ("SMHS"), and was treated by Dr. Marissa Vito Cruz, M.D.[5]  (R. at 257.)  Garrett reported that his right ear was bleeding and constantly draining, which worsened when the weather became warmer; additionally, he reported that he had been experiencing a lot of pain.  (R. at 257.)  Garrett admitted that he had not been taking his medication as prescribed.  (R. at 257.)  Dr. Cruz noted that Garrett continued to smoke and reported increased social phobia, irritability, anxiousness and nervousness.  (R. at 257.)  Dr. Cruz found that Garrett was a "[w]ell developed, well nourished" man and not in active distress.  (R. at 257.)  The examination showed that Garrett's "right ear show[ed] perforated eardrum with dried blood on the right tragus and cholestoma."  (R. at 257.)  Also, Dr. Cruz noted that Garrett's extremities showed no signs of

_____

[5] Information outside of the relevant time period, May 16, 2005, to March 28, 2007, is included

cyanosis, clubbing or edema. (R. at 257.) Dr. Cruz assessed Garrett with ostalgia secondary to chronic otitis media and bloody drainage out of the right ear. (R. at 257.) Dr. Cruz prescribed OmniCef and Lortab. (R. at 257.)

On December 30, 2002, Garrett presented to SMHS and was treated by Kellie Brooks, FNP. (R. at 255.) The visit was a follow-up to an emergency room visit at Lee Regional Medical Center, ("LRMC"), subsequent to an automobile accident on December 24, 2002. (R. at 255.) While at LRMC x-rays were taken of Garrett's right wrist, his chest and his right rib cage. (R. at 263-64.) The x-rays of the wrist were negative for a fracture, but a small cystic area was noted in the navicular bone. (R. at 263.) The x-rays of the rib cage were also negative for fractures. (R. at 263.) The x-ray of the chest showed that the heart was not enlarged and there was no acute cardiopulmonary disease; the lung fields showed some calcified density in the left hilum due to old granulomatous disease with calcified lymph nodes and no active infiltration. (R. at 264.) At the appointment with SMHS, Garret reported pain in his wrist and chest,[6] a knot on his head and a headache. (R. at 255.) Garrett's mother reported that he had been confused and sleepy since the incident. (R. at 255.) Brooks found Garrett to be alert and oriented and in no acute distress. (R. at 255.) Brooks was
unable to find the knot that Garrett reported on his head. (R. at 255.) Finally, Brooks noted that Garrett's ankle showed edema but no bruising. (R. at 255.) Brooks ordered x-rays and a computerized axial tomography, ("CT"), scan and advised Garrett not to take any pain medication because of

---

only for clarity of the record.
[6] Later in the same report, Brooks stated that Garrett denied having chest pain. (R. at 255.)

his head injury.  (R. at 255.)

Pursuant to Dr. Cruz's instructions, Garrett presented to LRMC for x-rays of the wrist and skull on December 31, 2002.  (R. at 262.)  No acute fracture or other abnormalities were identified.  (R. at 262.)  On January 6, 2003, Garrett reported to LRMC for a CT scan of his brain and no significant abnormalities were found.  (R. at 260-61.)

On November 3, 2003, Garrett called SMHS reporting that he had an earache that was "killing him."  (R. at 253.)  He requested that SMHS refill his medications and hold them for him.  (R. at 253.)  On November 26, 2003, Garrett reported to SMHS because of discharge from his right ear that had been occurring since an ear surgery four years prior to the visit.  (R. at 251-52.)  Garrett was treated by Dr. Deepti Kudyadi, M.D., who noted that Garrett was allergic to several antibiotics, Sulfa, Levaquin, Penicillin and Cipro.  (R. at 251.)  Garrett reported that, in the week prior to this visit, he had experienced worsened pain in his ear.  (R. at 251.)  Dr. Kudyadi noted that Garrett had tried Biaxin, which gave him temporary relief only to have the pain reoccur.  (R. at 251.)  Additionally, Garrett reported dizziness stemming from his ear surgery.  (R. at 251.)  It also was noted that Garrett continued to smoke.  (R. at 251.)  Dr. Kudyadi found Garrett to be alert and oriented in all spheres, that his mood and affect were appropriate, the strength in his extremities were normal and there was no clubbing, cyanosis or edema in the extremities.  (R. at 251.)  Dr. Kudyadi assessed Garrett with chronic otitis externa of the right ear canal with recent debridement four years ago with persistent problems since then.  (R. at 252.)  Dr. Kudyai prescribed Biaxin and stated that if it did not help he would try an antifungal because Garrett

could be experiencing fungal otitis externa. (R. at 252.) Additionally, Dr. Kudyadi made an appointment for Garrett to see an ear, nose and throat physician. (R. at 252.) To help treat his dizziness, Dr. Kudyadi prescribed Garrett Meclizine and advised him to take multivitamins. (R. at 252.)

Garrett reported to LRMC on August 31, 2003, complaining of a knee injury and knee pain. (R. at 318-327.) The injury occurred when Garrett was "walking on log" and lost his balance and fell. (R. at 321.) It was indicated that Garrett had minor abrasions on his left leg and edema of the left ankle and foot. (R. at 321.) Garrett was found to be alert and oriented in all spheres. (R. at 321.) An x-ray of the left ankle showed that there were no fractures and that there was "slight soft tissue swelling noted at the lateral aspect of the ankle." (R. at 326.) An x-ray of the left knee showed no fractures, dislocations or other significant abnormalities. (R. at 327.) It was assessed that Garrett had left knee and ankle contusions. (R. at 324.) Garrett was instructed to apply ice and keep his foot elevated. (R. at 325.)

On July 7, 2004, Garrett presented to Mountain Region Speech and Hearing for a Report of Audiological Evaluation after being referred by the Department of Disability. (R. at 201-203.) Garrett reported decreased hearing in his right ear since a surgery in 1996 or 1997, in which his eardrum and "middle ear bones" of the right ear were removed. (R. at 201.) Additionally, Garrett stated that he had problems with constant drainage from the ear and dizziness. (R. at 201.) An otoscopy found the ear canals to be free of excessive cerumen bilaterally. (R. at 201.) Puretone test results for the right ear revealed a profound mix of hearing loss; while puretone test results for the left ear revealed a borderline normal to mild sloping to moderate sensorineural

hearing loss.  (R. at 201.)  A speech discrimination score of 100% was obtained at a presentation level of 55 decibels.  (R. at 201.)  Negative stengers for speech and for puretones were obtained.  (R. at 201.)  It was recommended that Garrett that he receive a full vestibular evaluation because of his troubles with dizziness.  (R. at 201.)

On August 17, 2004, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC").  (R. at 204-09.)  Dr. Surrusco opined that Garrett could occasionally lift and/or carry items weighing up to 50 pounds and frequently lift and/or carry items weighing up to 25 pounds, sit, stand and/or walk for six hours out of an eight-hour workday and that his abilities to push and pull were unlimited.  (R. at 205.)  Further, Dr. Surrusco found that Garrett could frequently use ramps and climb stairs, stoop, kneel, crouch and crawl, and he found that Garrett could occasionally climb ladders, ropes and scaffolds and never balance.  (R. at 206.)  Dr. Surrusco did not note any manipulative or visual limitations.  (R. at 206.)  Dr. Surrusco noted that Garrett was limited in his ability to hear, but was unlimited in his ability to speak.  (R. at 207.)  In Dr. Surrusco's opinion, Garrett should avoid all exposure to hazards, such as heights and dangerous moving machinery, but no other environmental limitations were noted.  (R. at 207.)  Dr. Surrusco found Garrett's statements to be partially credible.  (R. at 209.)

Dr. Surrusco's findings were reconsidered by Dr. Michael J. Hartman, M.D., on December 6, 2004, and Dr. Hartman noted "nothing new" on the reconsideration.  (R. at 231.)  Dr. Hartman's findings were identical to those of Dr. Surrusco.  (R. at 227-

32.) These findings were reviewed and affirmed by Dr. Frank M. Johnson, M.D., on December 7, 2004. (R. at 232.)

On August 19, 2004, R.J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 210-223.) Milan opined that a Residual Functional Capacity Assessment of Garrett was necessary. (R. at 210.) Also, Milan found that Garrett suffered from an organic mental disorder, (R. at 210), namely borderline intellectual functioning and a learning disability, that did not precisely satisfy diagnostic criteria.[7] (R. at 211.) Milan opined that Garrett would experience mild limitations as to his daily activities and in maintaining concentration, persistence or pace, no limitations in maintaining social functioning and no episodes of decompensation were noted. (R. at 220.)

Milan noted that Garrett's previous SSI claim was denied and that he alleged psychological conditions of depression and anxiety. (R. at 222.) Milan further noted that Garrett's records did not support mental problems that required ongoing treatment, a referral to a psychiatrist or hospitalization. (R. at 222.) Milan also considered a 1999 psychological evaluation performed by B. Wayne Lanthorn, Ph.D., in which Garrett reported problems being in crowds, grouchiness, feeling mad at himself, feeling useless and an inability to talk. (R. at 222.) Lanthorn had noted that Garrett was able to concentrate, but appeared depressed. (R. at 222.) Additionally, the notes from Lanthorn's evaluation stated that Garrett did not attend special

_____

[7] An additional medically determinable impairment on the page is illegible. (R. at 211.) It is presumed that the impairment was dyslexia; however, it was still found not to satisfy diagnostic criteria. (R. at 211.)

education classes.[8] (R. at 222.)  A Wechsler Adult Intelligence Scale, third edition, ("WAIS-III"), showed significant discrepancies in scores with a verbal score of 92, performance score of 72 and full scale score of 85.  (R. at 222.)  Moreover, Milan indicated that Garrett did not have a driver's license, need help paying bills, using the telephone, handling banking information and completing insurance forms.   (R. at 222.)  Also, Garrett reported that he read a book a month, but did have some difficulty remembering what he has read. (R. at 222.)

Additionally, Milan completed a Mental Residual Functional Capacity Assessment, ("MRFC").  (R. at 224-226.)   Milan found that Garrett was not significantly limited in his ability to do the following: remember locations and work-like procedures; understand, carry out and remember very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal

---

[8] This information is incorrect; Garrett was in special education classes throughout his schooling. (R. at 138-150, 160-64, 168-76.)

hazards and take appropriate precautions; travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others; (R. at 224-25.) Milan opined that Garrett would be moderately limited in his ability to understand, carry out and remember detailed instructions. (R. at 224.) Milan noted that there was no evidence of limitation regarding Garrett's ability to make simple work-related decisions and ask simple questions or request assistance. (R. at 224-25.) Milan found Garrett's statements to be partially credible. (R. at 226.) In conclusion, Milan stated, "[t]he limitations resulting from the impairment do not preclude [Garrett] from meeting the basic mental demands of competitive work on a sustained basis." (R. at 226.)

On December 8, 2004, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a PRTF. (R. at 233-46.) Tenison opined that a Residual Functional Capacity Assessment would be necessary. (R. at 233.) Tenison found that Garrett suffered from a mental retardation disorder, (R. at 233), namely a learning disability, but found that the impairment did not fully satisfy diagnostic criteria. (R. at 237.) Tenison found that Garrett would suffer moderate limitations in his activities of daily living and maintaining concentration, persistence or pace and no limitations in maintaining social functioning. (R. at 243.) No episodes of decompensation were noted. (R. at 243.) Tenison stated that Garrett's mental allegations were not fully credible and that he had no record of mental health treatment. (R. at 245.) Tension opined that Garrett could engage in simple, unskilled work. (R. at 245.)

Tenison also completed an MRFC. (R. at 247-50.) Tenison found that Garrett was not significantly limited in the following abilities: to remember locations and

work-like procedures; understand, remember and carry out very short and simple instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions and set realistic goals or make plans independently of others. (R. at 247-48.) Tenison found that Garrett was moderately limited in his abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and travel in unfamiliar places or use public transportations. (R. at 247-48.)

Garrett presented to Norton Community Hospital on October 7, 2005, to have x-rays taken of his spine, which revealed no abnormalities. (R. at 270.) These results were provided to Dr. Kevin Blackwell, D.O., a state agency physician, who completed a consultative examination. (R. at 265-69.) Garrett presented to Dr. Blackwell complaining of pain and swelling, noting that the swelling went from his toes to his hips. (R. at 265.) Furthermore, Garrett alleged to have occasional pain in his legs. (R. at 265.) Garrett claimed to have suffered an injury to his right leg that he related

to a "mastoid problem causing me to be dizzy." (R. at 265.) Garrett also claimed to suffer from constant headaches on the right side where he had ear surgery, but reported that the surgery significantly improved his headaches and dizziness. (R. at 265.) Dr. Blackwell noted that Garrett had a family history of diabetes and heart disease. (R. at 266.)

Dr. Blackwell observed that Garrett was well-developed, well-nourished, alert and oriented in all spheres, cooperative, exhibited good mental status and that he was not in any acute distress. (R. at 267.) After an examination, Dr. Blackwell diagnosed that Garrett had right-sided hearing loss, bilateral lower extremity swelling of uncertain etiology and chronic low back pain. (R. at 267.)

Dr. Blackwell opined that Garrett would be limited to lifting items weighing up to 50 pounds "maximally" and items weighing up to 25 pounds frequently; squatting, kneeling and crawling would be limited to less than two-thirds of the day; he could sit or stand for eight hours out of an eight-hour workday, assuming he could change positions; he could understand and hear normal conversations, but if someone was on his right side he might not be able to hear; and Dr. Blackwell could not find any limitation involving the use of his hands, including fine motor movement skills. (R. at 267-68.) Dr. Blackwell stated that a functional capacity evaluation could better delineate Garrett's limitations. (R. at 268.) Dr. Blackwell did not assess Garrett's alleged social phobias or depression. (R. at 268.) An accompanying Range Of Motion Form indicated that all of Garrett's ranges of motion were within normal limits. (R. at 269.)

On October 14, 2005, Dr. Randall Hays, M.D., a state agency physician, completed a PRFC.  (R. at 271-277.)  Dr. Hays opined that Garrett could lift and/or carry items weighing up to 50 pounds occasionally and items weighing up to 25 pounds frequently, sit, stand and/or walk for six hours out of an eight-hour workday and his abilities to push and pull were unlimited.  (R. at 272.)  Further, Dr. Hays found that Garrett could occasionally climb ramps and stairs, but should never climb ladders, ropes and scaffolds and could occasionally balance, stoop, kneel, crouch and crawl.  (R. at 273.)  Dr. Hays did not note any manipulative, visual or speaking limitations, but noted that Garrett's hearing in his right ear would be limited, while hearing in his left ear would not.  (R. at 273-74.)  Dr. Hays noted no limitation as to exposure to extreme heat and cold, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, etc., but determined that Garrett should avoid concentrated exposure to hazards and should avoid even moderate exposure to noise.  (R. at 274.)  Dr. Hays's findings were reviewed and affirmed by Dr. Surrusco on January 3, 2006.  (R. at 275.)

Dr. Hays noted that he considered the medical evidence from treating sources and his findings about limitations and restrictions were significantly different from those reviewed.  (R. at 275.)  Dr. Hays stated that Garrett described daily activities that were significantly limited and that the limitations were consistent with other evidence in the case.  (R. at 277.)  Further, Dr. Hays noted that Garrett continued to have pain that significantly limited his ability to perform work related activities.  (R. at 277.)  Dr. Hays found that based on the evidence of record, Garrett's statements were "partially credible."  (R. at 277.)  Dr. Hays noted that the findings of Dr.

Blackwell on October 7, 2005, were partially consistent with his assessment. (R. at 277.)

A PRTF was completed on October 18, 2005, by Joseph Leizer, Ph.D, a state agency psychologist. (R. at 278-90.) Leizer opined that a Residual Functional Capacity Assessment was necessary and that there were "coexisting nonmental impairment(s) that require[d] referral to another medical specialty." (R. at 278.) Leizer found that Garrett suffered from an anxiety-related disorder, (R. at 278), not otherwise specified, that did not satisfy diagnostic criteria. (R. at 283.) Leizer found that Garrett had not experienced any episodes of decompensation, and he found that Garrett would experience mild limitations in his restriction of activities of daily living and moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 288.) Leizer noted consideration of the opinions of Dr. Blackwell, Lanthorn and notes from Stone Mountain Health Services. (R. at 290.) Leizer found that Garrett's allegations were "not fully credible" and that he should be able to perform simple, unskilled, non-stressful work. (R. at 290.)

Leizer also completed a MRFC on October 18, 2005, finding that Garrett was not significantly limited in the following abilities: remember locations and work-like procedures; understand, carry out and remember very short and simple instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of

18

others.  (R. at 291-94.)  Leizer opined that Garrett would be moderately limited in the following abilities: to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes and maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness.  (R. at 291-92.)  Leizer noted there was no evidence of limitation with respect to Garrett's ability to travel in unfamiliar places or use public transportation.  (R. at 292.)

On January 3, 2006, Milan completed a PRTF.  (R. at 295-307.)  Milan found that a Residual Functional Capacity Assessment was necessary.  (R. at 295.)  Milan opined that Garrett suffered from an anxiety-related disorder and an organic mental disorder.  (R. at 295.)  Milan noted the organic mental disorder was evidence by a history of a learning disability and the verbal and performance split on the WAIS-III test from 1999.  (R. at 296.)  However, Milan opined that the organic mental disorders did not satisfy diagnostic criteria.  (R. at 296.)  Milan also noted that Garrett had a history of anxiety, with no evidence of recent or current treatment, which did not satisfy diagnostic criteria.  (R. at 300.)  Milan found that Garrett would suffer moderate limitations in his activities of daily living, maintaining social functioning and in maintaining persistence, concentration or pace, but found no evidence of episodes of decompensation.  (R. at 305.)

Milan also completed a MRFC on January 3, 2006. (R. at 308-10.) Milan found that Garrett was not significantly limited in the following abilities: remember locations and work-like procedures; understand, remember and carry out very short and simple instructions; maintain concentration and attention for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. (R. at 308-09.) Milan opined that Garrett was moderately limited in his ability to understand, remember and carryout detailed instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others. (R. at 308-09.) Milan found that Garrett's statements were partially credible. (R. at 310.) Milan opined that Garrett could understand, retain and follow simple job instructions, i.e., perform one and two step tasks, carry out very short and simple instructions, maintain concentration and attention for extended periods of time, complete a normal workday and workweek without exacerbation of psychological symptoms, ask simple questions, accept instructions, make simple decisions and get along with others in the

20

workplace without distracting them.  In summation, Milan opined that Garrett could meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment.  (R. at 310.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims.  *See* 20 C.F.R. § 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. § 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step.  *See* 20 C.F.R. § 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 28, 2007, the ALJ denied Garrett's claim. (R. at 13-19.) The ALJ found that Garrett had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 18.) The ALJ found that Garrett suffered from the following severe impairments: hearing loss in his right ear resulting in vertigo, a learning disability and bilateral lower extremity swelling. (R. at 18.) However, the ALJ found that the impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. at 18.) The ALJ found that Garrett had the residual functional capacity to perform simple, repetitive, non-stressful work at the medium level of exertion and should not be put in a position that required acute hearing. (R. at 18.) Additionally, the ALJ found that Garrett could not climb ladders or balance and he should have the same protections as someone with a seizure disorder, such as not being around unprotected heights or dangerous moving machinery. (R. at 18.) The ALJ noted that despite Garrett's hearing loss, he could hear normal conversation in close proximity. (R. at 18.) The ALJ noted that Garret had no past relevant work experience and was a younger individual under 20 C.F.R. § 416.964. (R. at 18.) Based on Garrett's age, education, residual functional capacity and work experience, the ALJ found that Garrett could perform jobs existing in significant numbers in the national economy, including jobs as a hand packer, a sorter, an assembler, an inspector, a cleaner and a general laborer. (R. at 18.) As such, the ALJ found that Garret was not under a "disability" as defined by the Act. (R. at 19.) *See* 20 C.F.R. § 416.920(g) (2009).

Garrett argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For

Summary Judgment, ("Plaintiff's Brief"), at 8-15.) Specifically, Garrett claims that every medical opinion of record contains limitations that the ALJ ignored, as he failed to explain his apparent rejection of these limitations. (Plaintiff's Brief at 9-11.) Further, Garrett asserts that the ALJ's opinion is internally inconsistent, containing conflicts in the evidence that are unresolved by the ALJ. (Plaintiff's Brief at 11.) Additionally, Garrett argues that the ALJ substituted his opinion for that of a medical expert. (Plaintiff's Brief at 12.) Also, Garrett argues that the ALJ failed to indicate the weight given to each piece of medical evidence. (Plaintiff's Brief at 13-15.) Finally, Garrett claims that it was an error for the ALJ and the state agency psychologist to consider psychologist Lanthorn's opinion, which was not included in the record. (Plaintiff's Brief. at 14-15.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).

Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Garrett's claim that the ALJ's residual functional capacity determination was not supported by substantial evidence because the opinions of record contained limitations not included by the ALJ. (Plaintiff's Brief at 8-11.) Additionally, the court feels that Garrett's argument that it was an error for the ALJ not to indicate the weight given to the medical evidence of record, is best addressed in conjunction with the first argument. (Plaintiff's Brief at 13-14.)

The ALJ determined that Garrett had the residual functional capacity to perform simple, repetitive, non-stressful work at the medium level of exertion and he should not be placed in a position where he would need to have acute hearing, due to the deafness in his right ear; the ALJ noted that Garrett could hear a normal conversation in close proximity. (R. at 16, 18.) Additionally, the ALJ found that Garrett could not climb ladders or balance and should have the protections of someone with a seizure disorder, i.e., avoid unprotected heights and dangerous moving machinery. (R. at 16, 18.) In reaching his conclusions regarding Garrett's residual functional capacity, the ALJ stated that he gave "significant weight" to the opinions of Dr. Blackwell, psychologist Lanthorn and the state agency physicians. (R. at 16.)

On October 7, 2005, Dr. Blackwell performed a consultative examination of Garrett, the only one performed during the relevant time period. (R. at 265-70.) Dr. Blackwell opined that Garrett would be limited to lifting items weighing up to 50 pounds "maximally" and items weighing up to 25 pounds frequently; squatting, kneeling and crawling would be limited to less than two-thirds of the day; he could sit or stand for eight hours out of an eight-hour workday, assuming he could change positions; and noted that he could understand and hear normal conversations, but if someone was on his right side he might not be able to hear them. (R. at 267-68.)

On October 14, 2005, Dr. Hays, a state agency physician, found that Garrett could occasionally lift and/or carry items weighing up to 50 pounds and frequently lift and/or carry items weighing up to 25 pounds; sit, stand and/or walk for six hours out of an eight-hour workday; that he could never climb ladders, ropes or scaffolds and only occasionally use ramps and climb stairs, balance, stoop, kneel, crouch and crawl; should avoid even moderate exposure to noise; and should avoid concentrated exposure to hazards and he would be limited in hearing in his right ear. (R. at 272-74.) These findings were reviewed and affirmed on January 3, 2006, by Dr. Surrusco. (R. at 275.)

With regard to Garrett's physical residual functional capacity, the ALJ failed to include Dr. Blackwell's limitation that Garrett could only squat, kneel and crawl for less than two-thirds of the day. (R. at 13-19, 267-268.) The ALJ mentioned such findings in his opinion, yet they were not included in his determinations. (R. at 15.) Nor was the exclusion explained by the ALJ who, as noted above, mentioned

considerable reliance on Dr. Blackwell's opinion.  (R. at 16.)  Additionally, the ALJ failed to include the limitations imposed by Drs. Hays and Surrusco that Garrett could never climb ropes and scaffolds, only occasionally use ramps and climb stairs, crouch, kneel, stoop and crawl, and that Garrett should avoid even moderate exposure to noise.  (R. at 274.)

On October 18, 2005, Leizer, a state agency psychologist, found that Garrett would be moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (R. at 291-92.)

On January 3, 2006, Milan, a state agency psychologist, found that Garrett would be moderately limited in his abilities to understand, remember and carryout detailed instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, travel in unfamiliar places or use

public transportation and set realistic goals or make plans independently of others. (R. at 308-09.)

With regard to Garrett's mental residual functional capacity, the ALJ did not note any specific limitations other than limiting Garrett to simple, repetitive, non-stressful work. (R. at 16, 18.)  When the findings of psychologist Leizer were placed before the vocational expert, she opined that a combination of the limitations he found could eliminate the potential job base for Garrett. (R. at 342.)  Nevertheless, the ALJ failed to note any of the particular limitations, which could preclude Garrett from employment, or whether he was adopting or rejecting such findings. (R. at 13-19.)

Inexplicably, the ALJ has not included or discussed limitations found by state agency psychologists and physicians, which he noted heavy reliance upon, (R. at 16), making it impossible to determine how he reached the final residual functional capacity.  As the ALJ did not indicate the weight given to the relevant evidence this court cannot determine if his findings are supported by substantial evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).  Additionally, such limitations as noted by the vocational expert could have an impact on Garrett's ability to obtain and sustain employment. (R. at 342.)  Accordingly, the court agrees with Garrett and is of the opinion that the ALJ's decision was not supported by substantial evidence.

The court does not find it necessary to discuss Garrett's remaining arguments other than to note that the claims that the psychologists' failure to recognize that Garrett was in special education classes and the consideration of psychologist

Lanthorn's opinion were harmless errors.  While Lanthorn's opinion, which was from 1999 and clearly outside the relevant time period was not in the record, it supported and perhaps led to the ALJ's determination that Garrett had a learning disability.  (R. at 15, 18.)  As such, the consideration of Lanthorn's opinion was not to Garrett's detriment, but rather to his benefit.  Further, Lanthorn's notation that Garrett did not attend special education classes, (R. at 307), did not prevent the ALJ from determining Garrett had a learning disability.  (R. at 18.)  Accordingly, the arguments would not result in reversal of the ALJ, as they did not negatively impact his consideration.

*IV. Conclusion*

For the foregoing reasons, Garrett's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

**ENTER:** This 2nd day of December, 2009.

/s/  Glen M. Williams
SENIOR UNITED STATES DISTRICT JUDGE